

JUDGE SCHEINDLIN

Michael J. Frevola
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
SEATRANS ERMEFER TANKERS AS

RECEIVED
MAR 03 2008
U.S.D.C. S.D N.Y.
CASHIER'S

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SEATRANS ERMEFER TANKERS AS,

Plaintiff,

-against-

LIO YAG SANAYI VE TICARET A.S. a/k/a LIO
YAG SAN. VE TIC. A.S.,

Defendant.

08 Civ. _____

**VERIFIED**
**COMPLAINT**

---

Plaintiff, Seatrans Ermefer Tankers AS ("Seatrans" or "Plaintiff"), by and through its

attorneys, Holland & Knight LLP, for its verified complaint against Lio Yag Sanayi Ve Ticaret

A.S. a/k/a Lio Yag San. Ve Tic. A.S. ("Lio Yag" or "Defendant"), alleges, upon information and

belief, as follows:

    1.    This is a case of admiralty and maritime jurisdiction as hereinafter more fully

appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil

Procedure.

2.      At all times material herein, Seatrans is and was a business entity organized and existing under the laws of the Norway with its postal business address at P.O. Box. 15, Nesttlun, 5852 Bergen, Norway and its principal place of business at Wernersholmvei 5, Hop, N-5232 Paradis, Norway.

3.      Upon information and belief, at all times material herein, defendant Lio Yag is and was a business entity organized and existing under the laws of Turkey with its principal place of business at A.O.S.B. 10003 Sokak no. 3, Cigli 35620, Izmir, Turkey.

4.      On or about June 8, 2005 Seatrans and Lio Yag entered into a voyage charter party (the "Charter") to ship a cargo of corn oil from Santos, Brazil to Izmir, Turkey aboard the TRANS IBERIA ("Vessel"), which Charter was memorialized via a fixture recap, dated June 8, 2005. A true and correct copy of the fixture recap is annexed hereto as Exhibit 1.

5.      The Charter included the standard VEGOILVOY charter party terms. A true and correct copy of the VEGOILVOY *pro forma* charter party is annexed hereto as Exhibit 2.

6.      Under the terms of the Charter contained within the parties' fixture recap Seatrans is entitled to $20,000 per day or pro rata for demurrage in the event that the Vessel is prevented from loading and discharging the cargo within the agreed amount of laytime.

7.      The terms of the Charter state that laytime is established at 85.503042 hours or 3.562627 days.

8.      In this case, the net time of the Vessel's loading and discharge exceeded the agreed laytime by 1.733709 days, which at a rate of $20,000 per day establishes damages for Seatrans in demurrage in the amount of $34,674.18. A true and correct copy of Seatrans' demurrage calculation is annexed as Exhibit 3.

9.     On or about August 26, 2005, Seatrans demanded payment from Lio Yag for $34,674.18 for demurrage, which after several reminders Lio Yag has refused to pay.

10.    The Charter is governed by English law, which routinely allows for costs, including a reasonable allowance for attorney's fees.

11.    Upon information and belief it will take two years to bring this dispute to conclusion, resulting in the following estimated interest and attorneys' fees and costs:

| | | |
|---|---|---|
| Interest: | $ 9,393.38 | ($34,674.18 x 0.06/year from August 26, 2005 through March 1, 2010) |
| Attorneys' fees | $ 35,000.00 | |
| Total Principal Claim: | $ 34,674.18 | |
| Total Sought: | **$ 79,067.56** | |

12.    Lio Yag is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of Petroexport Ltd. with, upon information and belief, the following financial institutions:  Bank of America, N.A.; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; or any other financial institution within the Southern District of New York.

**WHEREFORE**, Seatrans Ermefer Tankers AS prays:

1.    That a summons with process of attachment and garnishment may issue against the defendant, Lio Yag Sanayi Ve Ticaret A.S. a/k/a Lio Yag San. Ve Tic. A.S.; and if defendant

cannot be found, then that its goods, chattels and credits within the district, and particularly all bank accounts and other property of Lio Yag Sanayi Ve Ticaret A.S. a/k/a Lio Yag San. Ve Tic. A.S. with the financial institutions noted above in paragraph 12, may be attached in an amount sufficient to answer plaintiff's claim;

2.      That defendant Lio Yag Sanayi Ve Ticaret A.S. a/k/a Lio Yag San. Ve Tic. A.S. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.      That judgment be entered in favor of Seatrans Ermefer Tankers AS and against Lio Yag Sanayi Ve Ticaret A.S. a/k/a Lio Yag San. Ve Tic. A.S. in the amount of US $79,067.56 (including estimated interest, expenses and attorneys' fees); and,

4.      That this Court grant Seatrans Ermefer Tankers AS such other and further relief which it may deem just and proper.

Dated: New York, New York
       March 3, 2008

                                 HOLLAND & KNIGHT LLP

                        By: _____
                                 Michael J. Frevola
                                 Lissa Schaupp
                                 195 Broadway
                                 New York, NY 10007-3189
                                 Tel:    (212) 513-3200
                                 Fax:    (212) 385-9010

                                 *Attorneys for Plaintiff*
                                 *Seatrans Ermefer Tankers AS*

4

## VERIFICATION

STATE OF NEW YORK          )

                                    :ss.:

COUNTY OF NEW YORK        )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Seatrans Ermefer Tankers AS ("Seatrans"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Seatrans and corresponded with Seatrans' representatives regarding this matter. I am authorized by Seatrans to make this verification, and the reason for my making it as opposed to an officer or director of Seatrans is that there are none within the jurisdiction of this Honorable Court.

_____
Michael J. Frevola

Sworn to before me this
3rd day of March, 2008

_____
Notary Public

WALLIS BETH KARPF
Notary Public, State Of New York
No. 01KA6047092
Qualified In New York County
Commission Expires August 28, 20 /0

# 5146017_v1

5

# EXHIBIT 1

Reference number: 004C0530                Exp. Date: 23.07.2005                Created: 08.06.2005 15:52:11

From:        "Will De'Ath" <wd@straship.com>
To:          <chartering@uscpool.com>
cc:
Subject:     Trans Iberia / Lio Yag San. Ve Tic. A.S.
Company:     USCPool
Department:  Chartering

Categories
Vessel name
Voyage number
Category
Business Partner
Cargoes
Chemical Type
Handled by

FRODE / WILL

WE ARE PLEASED TO RECAP FOLL CLEAN  FIXTURE CONCLUDED TODAY  8/6/2005 BETWEEN MESSRS SEATRANS
ERMEFER TANKERS, BERGEN  - NORWAY AT T/C OWNERS AND MESSRS
LIO YAG SAN. VE TIC. A.S., TURKEY AS  CHRTRS:

- Strictly Private &  Confidential

Account    Lio Yag San. Ve Tic.  A.S.

Owners    Seatrans Ermefer Tankers, Bergen -  Norway, as T/C Owner

M/T        Trans Iberia OOS
Imo        9170597
Built      2000
Flag       Norwegian  (NIS)
Class      DNV
Dwt        19.733  Mt
Draft      10,075  M
Capacity   20.332 Cbm at 98  %
Lining     Fully Stainless  Steel
LOA        151,48  M
Beam       23,50  M
NRT        6.004
GRT        13.015

LAST 3  CARGOES:

LAST         : lube oil/n.para/para xylene/acetone/gasoiline
2ND LAST:gasoline  unl/px/methanol/meth acr/acitic acid/2 eha/lysine/ipa/acn
 3RD LAST:ipa/unl gasoline/methanol/acn/dea/lysine/iba/ethyl
acetate/ttriethanolamine/n butyl  acetrate/isomerate/acetic acid

For

- Cargo       min 4000 mts 1 grade cornoil
- Tolerance   2 pct MORE  CHOPT
- Loading         1 spb Santos Vopak berth, Alemoaberth.
- Discharge   1 spb Izmir or  Gebze at chopt, decl 7 days  after sailing loadport
- Laycan      14-22 June, 2005
                 eta on/abt june 14/17 as usual agw/wp/ucae/wog.
- C/P   vegoilvoy
- Laytime    150/70  mt/hr load/disch shinc  rev.
- Demurrage USD  20,000 PDPR
- Freight USD 70,-pmt  bss 1/1 payable osbl in any case before  breaking
  bulk.
- six hours  notice to count.
- last three cargoes clean/unl and last cargo not to  appear on the
  fosfa banned list.
- it is not accepted to have other cargoes of cornoil  to any turkish port,
  therefore owners guarantee this vessel is going  to turkey for this cargo.
- Bimco isps
- Owners rot/compl/segr
- Ga arb London English Law
- YA 94
- Owners agents bends
- Brazilian tax cls
- otherwise based onTrans Scandic cp 24-5-04, with logical amendments.
- 5pct here on  frt/dfrt/dem
- end  recap.
++

Frode as requested  tried to insert "unless used" but Chrtrs were not too happy so asper your  instructions we did
not make a big deal out of it.

Thanks for your  support, Charterparty will be drawn up.

Best regards,

Will De'Ath SSY CHEMS  LONDON


------------------------------------------------------------------------------

This verifies that this message  has been checked for virus and deemed virus-free
according to F-secure Content Scanner 5.0
Wed, 8 Jun 2005 09:41:51 -0400 GMT

------------------------------------------------------------------------------


Original Author: "Will De'Ath" <wd@straship.com>          Exp. Date: 23.07.2005                    Created: 08.06.2005 15:52:11

# EXHIBIT 2

– 178 –

Form 114—Um & Co., 24 Beaver St. N. Y.—25961

**VEGOILVOY**

# TANKER VOYAGE CHARTER PARTY
## PREAMBLE

CHARTER PARTY made as of ........................................., 19    , at ..........................................................

by and between ................................................................................................................................

(hereinafter called the "Owner") of the good ............................MS/SS ......................................,

(hereinafter called the "Vessel") and ..............................................................................................

Charterer (hereinafter called the "Charterer").

(a)    The Vessel shall receive from the Charterer or supplier at the port or ports of loading, or so near thereto as she may safely get, always afloat, the cargo described in Part I, for delivery as ordered on signing bills of lading to the port or ports of discharge, or so near thereto as she may safely get always afloat; and there discharge the cargo; all subject to the terms, provisions, exceptions and limitations contained or incorporated in this Charter Party, which shall include the foregoing preamble and Parts I and II. In the event of a conflict, the provisions of Part I shall prevail over those contained in Part II to the extent of such conflict.

Each of the provisions of this Charter Party shall be and be deemed severable, and if any provision or part of any provision should be held invalid, illegal or unenforceable, the remaining provisions or part or parts of any provisions shall continue in full force and effect.

## PART I

A.  Description and Position of Vessel.

   Net Registered Tonnage:

   Total Deadweight:                    tons of 2,240 lbs. each on            draft in salt water on assigned summer freeboard.

   Capacity for cargo:                  bbls. of 42 American gallons each at 60° F. or        tons of 2,240 lbs. each (10%
      more or less, Vessel's option).

   Classed:                                        Now:

B.  Part—Full Cargo.

   If this Charter Party is for a full cargo, then it shall be the quantity the Vessel can carry if loaded to her minimum permissible freeboard for the voyage, but not exceeding what the Vessel can, in the Master's judgment, reasonably stow and carry over and above her tackle, apparel, stores, and furniture, sufficient space to be left in the expansion tanks to provide for the expansion of the cargo. In no event shall Charterer be required to furnish cargo in excess of the quantity stated as the Vessel's capacity for cargo plus 10% of that quantity. If less than a full cargo is to be carried, the quantity stated shall be the minimum quantity which the Charterer is required to supply.

C.  Loading Port.

   Readiness Date:                              Cancelling Date:

D.  Discharging Port.

E.  Total Laytime                     for loading ;                             for discharging
      (Running Hours.)

F.  Freight Rate.

                                        Freight Payable at :

G.  Demurrage per Hour.

H.  Special Provisions.—

— 180 —

## PART II

1. WARRANTY. (a) The Owner shall, before and at the commencement of the voyage, exercise due diligence to make the Vessel seaworthy, properly manned, equipped, and supplied for and during the voyage, and to make the pipes, pumps, and heater coils tight, staunch, and strong, in every respect fit for the voyage, and to make the tanks, holds, and other spaces in which cargo is carried fit and safe for its carriage and preservation.
(b) It is understood that if the tank or tanks into which the particular cargo covered by this Charter is to be placed, upon testing prove to be defective the Owner undertakes to execute the necessary repairs, provided repairs can be effected within 24 hours and at reasonable expense; otherwise, Owner has the option of cancelling this Charter in which case no responsibility shall rest with the Vessel, Owners, or Agents.

2. TIME FOR READINESS OF CARGO. Charterer warrants that the cargo shall be available for loading at the designated loading port upon arrival of the Vessel within the Readiness and Cancelling date shown in Part I hereof. Any delay suffered by the Vessel for failure to conform to this warranty shall count as used lay time.

3. READINESS AND CANCELLING DATE. Laytime shall not commence before the readiness date named in Part I, unless otherwise provided in this Charter, or unless the Charterer accepts a notice of readiness or orders or permits the Vessel to berth before that date, or otherwise waives the provisions of this paragraph. If the Vessel is not ready to load by 4.00 p.m. (local time) on the cancelling date named in Part I, the Charterer shall have the option of cancelling this Charter by giving the Owner notice of such cancellation within twenty-four (24) hours after the cancelling date; otherwise this Charter shall remain in full force and effect. The Charterer may in its notice of cancellation specify that it will nevertheless accept the Vessel if she is ready to load on or before a date or time that Charterer may designate in such notice in which event the Owner may at its option either treat this Charter Party as cancelled or tender the Vessel on or before the date named by the Charterer in its notice, whereupon this Charter shall remain in full force and effect.

4. NOTICE OF READINESS AND COMMENCEMENT OF LAYTIME.
(a) When the Vessel has arrived at the port of loading or discharge and is ready to load or discharge, a notice of readiness shall be tendered to the Charterer or its agent by the Master or Agent by letter, telegraph, wireless or phone. The Vessel shall be deemed ready within the meaning of this clause whether she arrives during or outside of usual business hours, whether she is in or out of berth or whether or not she has ballast water or slops in her tanks. Laytime shall commence either at the expiration of six (6) running hours after tender of notice of readiness, Vessel in or out of berth, except that any delay to the Vessel in reaching her berth caused by the fault of the Vessel or Owner shall not count as used laytime; or immediately upon the Vessel's arrival in berth (i. e. finished mooring when at a seamloading or discharging terminal and all fast when loading or discharging alongside a wharf) with or without notice of readiness, whichever first occurs.
(b) Notwithstanding anything contained in paragraph (a) of this clause, laytime shall commence when the Vessel arrives at the loading or discharging port, whether or not berth is available; provided that notice of readiness shall always be tendered as therein stipulated.

5. LAYTIME. (a) The number of running hours specified as laytime in Part I shall be permitted the Charterer for loading, discharging, and used laytime; but any delay due to breakdown or inability of the Vessel's facilities to load or discharge the cargo within the time allowed shall not count as used laytime. If regulations of the Owner prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee, or the port authorities prohibit loading or discharging at night, time so lost shall count as used laytime. The Vessel shall have the right to sail from all ports immediately upon the completion of loading or discharging whether or not laytime has expired.
(b) Where commingled shipments, or separate shipments, are loaded or discharged concurrently at the same installation, the laytime allowed to each shipper shall be the gross number of hours allowed any of the commingled or separate shipments, it being conclusively presumed that loading and discharging of all such shipments shall commence simultaneously.

6. SAFE BERTH, SHIFTING. (a) If under Part I hereof the Charterer is given the right to name the loading and discharging berth, the Vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided that the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer.
(b) If under Part I hereof the Charterer is given the right to load or discharge at more than one berth, the Charterer shall arrange with the agent of the Vessel for shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to the next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense. Customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time lost to the Vessel on account of shifting shall count as used laytime.
(c) Notwithstanding anything contained in paragraphs (a) and (b) of this clause, the Charterer warrants that the cargo shall be discharged at the ports and berths specified in Part I. Any change in loading or discharging ports or berths shall be made only as the result of special agreement in writing between Charterer and Owner, and in such case, Charterer shall assume all cost incident to such change, including the value of the Vessel's time if the voyage is prolonged thereby.
(d) Lighterage. Lighterage at port of loading shall be at the risk and expense of Charterer. The Charterer shall deliver cargo to alongside Vessel as instructed by Owner, and the Owner shall provide a berth immediately alongside the Vessel for the barge or barges carrying the cargo after which pumping shall commence and proceed continuously.

7. PUMPING IN AND OUT. HOSES. (a) The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or consignee. The Vessel shall furnish her pumps and the necessary steam for discharging in all ports where the regulations permit of fire on board, as well as necessary hands. Should regulations not permit fires on board, the Charterer or consignee shall supply, at its expense, all steam necessary for discharging as well as loading, but the Owner shall pay for steam supplied to the Vessel for all other purposes. If cargo is loaded from lighters, the Vessel, if permitted to have fires on board, shall, if required, furnish steam to lighters at Charterer's expense for pumping cargo into the Vessel.
(b) Hoses—All hose (suitable to fit Vessel's connection) and other necessary equipment and labor to accomplish delivery of cargo to be provided by Charterer at Charterer's risk and expense.
(c) Stevedoring—If stevedoring is required, it is to be arranged and paid for by the Charterer.
(d) Steam—Vessel to furnish steam at its expense for the operation of receiver's pumps at port of discharge.
(e) Housegoing—Housegoing to be paid by the Owner and time used is not to count as used laytime.
(f) When shipments are commingled before loading—The cargo to be carried pursuant to this Charter Party has been or will be commingled with cargo belonging to other Charterers prior to loading, and will be loaded into the tanks of the Vessel without separation or identification. Neither the Vessel nor Owner assumes any responsibility for the consequences of such commingling, nor for separation of the several consignments at the time of delivery. The Vessel undertakes to deliver only that proportion of the cargo actually loaded in the designated tanks which is represented by the percentage that the amount specified in the Bill of Lading issued for the cargo covered by this Charter Party bears to the total of the commingled shipments delivered at destination.
(g) When shipments are to be commingled upon loading in the tanks of a vessel—It is understood that the Vessel will carry cargoes supplied by other Charterers to be carried subject to the terms of substantially similar part-cargo charter parties. Where the products are similar, the Vessel shall have the right to commingle such products in the tanks of the Vessel, in which case the Vessel undertakes to deliver only that proportion of the cargo actually loaded in the designated tanks which is represented by the percentage at the total amount specified in the Bill of Lading bears to the total of the commingled shipments delivered at destination. Neither the Vessel nor Owner assumes any responsibility for the consequences of such commingling, nor for the separation thereof at the time of delivery.
(h) Unless notation or exception is made in writing on the bill of lading.

(b) If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to the infected wharf he shall bear the expense of fumigation.

14. CLEANING. Prior to loading, Charterer shall inspect the designated tanks for the purpose of determining that they are in suitable condition for the loading and carriage of the cargo specified hereunder. Acceptance of the tanks by Charterer's representative shall be conclusive as to their suitability for such purposes. If Charterer's representative does not accept the tanks as suitable for the cargo, the Owner shall have the right, at its option, to cancel this Charter Party, without any resulting liability on the part of either party, or to again clean the tanks, subject to inspection as above.

16. HEATING. (a) If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested. Notwithstanding any other provisions herein the Owner shall not be responsible if such temperatures are not maintained by reason of any cause beyond the Owner's control and the laytime and demurrage provisions herein shall remain in full force and effect. The burden of proving the failure to exercise due diligence shall lie on the Charterer or person claiming damage or other relief. Whenever the Owner's failure to maintain temperatures is excused under this or any other provision of this Charter, Charterer shall assume all risks of delay during discharge due to the nature or condition of the cargo and shall pay demurrage if any.
(b) Unless agreed to in writing by Owner, the Vessel is not under any obligation to heat the cargo, but Owner reserves the right to heat the cargo to facilitate discharge.
(c) If Charterer decides that heat ought to be applied to the cargo, Charterer's instructions to Owner will be in the following form: "Please instruct the Master ...... hours before arrival at discharge port to apply heat to cargo so that on arrival at discharge port the temperature about two feet above the coils shall be about ... degrees Fahrenheit and to maintain approximately that temperature during discharge."

17. GENERAL EXCEPTIONS CLAUSE. (a) Neither the Vessel nor the Master or Owner shall be or shall be held liable for any loss of or damage or delay to the cargo or for any failure in performing hereunder arising or resulting from:—Any act, neglect or default of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; barratry; fire, unless caused by the personal design or neglect of the Owner; collision; stranding; perils, dangers or accidents of the seas or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk or any loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer, shipper, consignee, owner of the goods or holder of the bill of lading, their agents and representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery, equipment or appurtenances; unseaworthiness of the Vessel whether existing at the beginning of the voyage or developing during the voyage unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy, or to have her properly manned, equipped, and supplied; leakage; shrinkage; evaporation; change in quality of the cargo; handling or transportation losses; difference between actual or reported intake and outturn quantities; stowage or contact with or leakage from other cargo; discoloration; contamination; deterioration; any consequence arising out of shipping more than one grade of cargo; or from any other cause arising without the actual fault or privity of the Owner. And neither the Vessel, her Master or Owner, nor the Charterer shall, unless otherwise in this Charter expressly provided, be responsible for any loss of or damage or delay to or failure to discharge or deliver the cargo arising or resulting from:—Act of God; act of war; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strikes, lockouts, stoppage or restraints of labor from whatever cause whether partial or general; or riot or civil commotion. No exemption afforded the Charterer under this clause shall relieve the Charterer of or diminish its obligations for payment of any sums due the Owner under other provisions of this Charter.
(b) The tanks having been inspected by the Charterer's inspector as to tightness and cleanliness, notwithstanding any other provision of this Charter, neither the Vessel nor the Owner shall be liable for loss or damage due to contamination, deterioration, discoloration or change in quality or characteristics, or leakage, unless there is negligence on the part of the Vessel.

18. JASON CLAUSE. In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequences of which the Owner is not responsible by statute, contract, or otherwise, the cargo, shippers, consignees, or owners of the cargo shall contribute with the Owner in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the salving ship or ships belong to strangers.

19. BOTH TO BLAME COLLISION CLAUSE. If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

20. GENERAL AVERAGE. General average shall be adjusted, stated and settled, according to York-Antwerp Rules 1950, at such port or place in the United States as may be selected by the Owner, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment, disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the Owner, must be furnished before delivery of the cargo. Such cash deposit as the Owner or his agents may deem sufficient as additional security for the contribution of the cargo and for any salvage and special charges thereon, shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owner before delivery. Such deposit shall, at the option of the Owner, be payable in United States money, and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the general average and refunds or credit balances, if any, shall be paid in United States money.

21. DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel or stores at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

22. OTHER PORTS. If this Charter Party is for a part cargo:—(a) Owner has the right, either before or after loading cargo covered by this Charter Party, to load or discharge cargo belonging to the Charterer or others in any ports, rotation of ports to be at Owner's option; (b) Owner has privilege of discharging the cargo covered by this Charter Party at any port and to tranship it at Owner's risk and expense by any vessel or other means of transportation by water, or by rail, to the destination shown in Part I of this Charter Party.

23. LIMITATION OF LIABILITY. (a) Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force. Nothing in this charter shall operate to limit or deprive the Owner of any statutory exceptions or limitation of liability on the theory of personal contract or otherwise.

# EXHIBIT 3

Lio Yag San. Ve Tic. A.S.
A.O.S.B. 10003 Sokak no: 3
Cigli 35620
IZMIR
TURKEY

# Demurrage Calculation

| | |
|---|---|
| Vessel: | TRANS IBERIA |
| Voyage: | 06/05 |
| Fixture no: | 07829 |
| C/P date: | 08.06.2005 |
| Loading: | SANTOS |
| Discharging: | IZMIR |
| Laycan: | 14. - 22.06.2005 |
| Cargo: | 4080,827 mts Corn Oil |
| Demurrage: | 20 000,00    USD |
| Allowed laytime: | 85,503042    hrs |

| | | |
|---|---|---|
| TOTAL LAYTIME CONSUMED | | 5,296336 Days |
| ALLOWED AS PER C/P | | 3,562627 Days |
| TIME ON DEMURRAGE | | 1,733709 Days |
| **DEMURRAGE PAYABLE** | **USD** | **34 674,18** |

Enclosures:    S.O.F. + N.O.R.

*0,539264 days  hvis man trekker fra force can i disport*

**Port of loading:    Santos**

| | Date | Time |
|---|---|---|
| End of Seapassage | 15.06.05 | 09:30 |
| N.O.R. Tendered | 15.06.05 | 09:30 |
| All fast | 15.06.05 | 12:34 |
| Hose connected | 15.06.05 | 14:40 |
| Commenced loading | 15.06.05 | 15:50 |
| Completed loading | 16.06.05 | 22:00 |
| Hose disconnected | 16.06.05 | 23:15 |
| | | |
| Time to count as from | 15.06.05 | 12:36 |
| until | 16.06.05 | 23:15 |
| | | *1,443750* |
| Less due to other cargo loaded simultaneously *) | | 0,206442 |
| *Laytime consumed at loadport* | | *1,237308 Days* |

*) Cargo loaded simultaneously as Corn oil: total 2099,484 mts
Time for comm. loading other cgo: 15.06/17:55 - time compl. loading other cgo 16.06/08:30
Total time used for loading other cgo: 14 hrs 35 min
Time to be deducted: (2099,848 mts / 6180,675 mts)*14hrs 35min ≈ 4hrs 57 min/0,206442 days

**Port of discharging: Izmir**

| 1st call. | Date | Time |
|---|---|---|
| End of Seapassage | 14.07.05 | 10:00 |
| N.O.R. Tendered | 14.07.05 | 10:00 |
| Anchored | 14.07.05 | 10:50 |
| 6 hours noticetime, laytime commence | 14.07.05 | 16:50 |
| Anchor aweigh *) | 15.07.05 | 21:30 |
| | | |
| Time to count as from | 14.07.05 | 16:50 |
| until | 15.07.05 | 21:30 |
| | | 1,194444 |

*Laytime consumed at dischargeport*                    1,194444  *Days*

\*) Vsl heaved anchor and sailed due to missing freight and upcoming weekend.

**Port of discharging: Izmir**

| 2nd call | Date | Time |
|---|---|---|
| End of Seapassage | 28.07.05 | 12:30 |
| N.O.R. Tendered | 28.07.05 | 13:00 |
| Anchored | 28.07.05 | 13:20 |
| Anchor aweigh | 29.07.05 | 10:20 |
| All fast | 29.07.05 | 11:05 |
| Hose connected | 29.07.05 | 15:05 |
| Commenced discharging | 29.07.05 | 15:50 |
| Completed discharging | 31.07.05 | 10:20 |
| Hose disconnected | 31.07.05 | 10:50 |
| | | |
| Time to count as from | 28.07.05 | 13:20 |
| until | 31.07.05 | 10:50 |
| | | 2,895833 |
| Less shifting from anchorage to berth | | 0,031250 |

*Laytime consumed at loadport*                    2,864583  *Days*